

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

MABEL CROCKETT,                                          )
BRENDA ARNOLD                                           )
CONSTANCE SMITH,                                        )
JOHN HUGHES,                                            )
MARTHA HUGHES,                                          )
                                                        )
        Plaintiffs,                                  )
                                                        )
v.                                                      )
                                                        )
CAVALRY PORTFOLIO SERVICES, LLC,                        )
    SERVE:    The Corporation Trust Incorporated  )
                351 West Camden Street            )
                Baltimore, MD 21201              )
                                                        )
CAVALRY INVESTMENTS, LLC,                               )
    SERVE:    CT Corporation System             )
                4701 Cox Rd., Ste. 301            )
                Glen Allen, VA 23060             )
                                                        )
CAVALRY SPV I, LLC,                                     )
    SERVE:    CT Corporation System             )
                4701 Cox Rd., Ste. 301            )
                Glen Allen, VA 23060             )
                                                        )
CAVALRY SPV II, LLC,                                    )
    SERVE:    The Corporation Trust Company     )
                Corporation Trust Center         )
                1209 Orange Street               )
                Wilmington, DE 19801             )
                                                        )
        Defendants.                                  )

Civil Action No.

_3:13CV254_

## COMPLAINT

COME NOW the Plaintiffs, Mabel Crockett ("Ms. Crockett"), Brenda Arnold ("Ms. Arnold"), Constance Smith ("Ms. Smith"), John Hughes ("Mr. Hughes"), and Martha Hughes ("Mrs. Hughes", or all collectively referred to as "Plaintiffs"), by counsel, and as for their Complaint against the Defendants, they allege as follows:

1.      This is an action for actual, statutory, treble and punitive damages, declaratory and injunctive relief, costs, and attorneys' fees brought pursuant to the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* ("FDCPA"), the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961, *et seq.* ("RICO"), and under Virginia law for the Defendants' abuse of process.

## JURISDICTION

2.      This Court has jurisdiction pursuant to 15 U.S.C. § 1692k, and 28 U.S.C. § 1331 and § 1367.

## PARTIES

3.      Plaintiffs are natural persons who reside in the Commonwealth of Virginia and at all times relevant to this Complaint were each a "consumer" as that term is defined by the FDCPA.

4.      Defendant Cavalry Portfolio Services, LLC, ("CPS"), is a Delaware limited liability company with its headquarters and principal place of business located in Valhalla, New York. It regularly collects debts from consumers located across the Commonwealth of Virginia.

5.      Defendant Cavalry Investments, LLC ("Cavalry") is a Delaware limited liability company with its headquarters and principal place of business located in Valhalla, New York. It regularly conducts business in the Commonwealth of Virginia.

6.      Defendant Cavalry SPV I, LLC ("SPV I") is a Delaware limited liability company with its headquarters and principal place of business located in Valhalla, New York. It regularly collects debts from consumers located across the Commonwealth of Virginia.

7.     Cavalry SPV II ("SPV II") is a Delaware limited liability company with its headquarters and principal place of business located in Valhalla, New York. It regularly collects debts from consumers located across the Commonwealth of Virginia.

## STATEMENT OF FACTS

8.     Defendants operate as a debt buying enterprise. Cavalry is not simply a parent holding company of CPS, SPV I, and SPV II. Instead, all four Defendants operate as parts of a single business operation. Cavalry provides management and decision-making, SPV I and SPV II exist as employee-less paper entities that hold title to the enterprise's purchased debt portfolios and CPS operates as the front for contact with the targeted debtor-consumers, calling itself the "servicer" of the Defendants' collection accounts.

9.     Cavalry does not operate independent of CPS, SPV I, and SPV II. It does not have a separate office, separate management or separate business and income. Instead, they are all interrelated and inseparably operate as a single business operation.

10.     In fact, Defendants' webpage states, "Cavalry SPV I, LLC is one of Cavalry Investments, LLC's three affiliates, Cavalry SPV II, LLC and Cavalry Portfolio Services, LLC are the remaining two affiliates. Each affiliate provides support to the key business objectives." http://www.cavalryspvi.com/Affiliates/affiliates.htm (last visited Nov. 26, 2012).

11.     The majority of "officers" of Cavalry or CPS are also officers or directors of other Cavalry subsidiaries.

12.     Cavalry has little or no income that is not directly derived from CPS, SPV I, and SPV II.

13.     SPV I and SPV II do not have any employees. Instead, they are shell entities used by Cavalry to purchase and hold technical ownership of the debt portfolios Cavalry purchases.

3

Cavalry and CPS hold all of the company's personnel and active resources. SPV I and SPV II purchase the debt portfolios, and then CPS duns the consumer debtor "on behalf" of SPV I and SPV II.

14.     The single and principal business purpose of each Defendant is the collection of debts, and each Defendant is a debt collector as that term is defined at 15 U.S.C. § 1692a(6). Each Defendant uses various instrumentalities of interstate commerce and the mails in the business for which the principal purpose is the collection of any debts.

15.     For example, and without limitation, Cavalry engages in interstate commerce by shopping for, pricing and negotiating to purchase large portfolios of consumer debt from third parties creditors – often charged off credit card debt from credit card companies. These acts are accomplished using the telephone wires, computer wires, and/or the United States postal service. All of these steps are taken by individuals who are employed by Cavalry. They are accomplished for the sole purpose of collecting these defaulted debts from consumers. The single way that Cavalry makes money from these accounts is collecting on them from consumers.

16.     Similarly, SPV I and SPV II are debt collectors. They are created for the single purpose of facilitating and causing the collection of the accounts that Cavalry purchases. Title to the accounts is held in the name of SPV I and SPV II, which is analogous to Cavalry's "filing cabinet" in which it stores the purchased accounts while it tries to collect them from consumers. SPV I and SPV II are the title owners to these Cavalry purchases, and they then become the named "Plaintiff" in the collection actions brought by the Defendants around the country. Most of their actions require the use of the mails and interstate commerce for the purpose of collecting consumer debts.

4

17.    CPS, on the other hand, serves as the frontline company that deals directly with targeted consumer debtors. CPS directs the actions of the personnel who interact with the debtors and with the Defendants' third-party collection law firms, allegedly as the agent of SPV I and SPV II. Again, much of its work and tasks require the use of the mails and interstate commerce for the purpose of collecting consumer debts. For example, CPS does so by causing lawsuits to be filed across the Commonwealth of Virginia (and the country) on behalf of Defendants SPV I and SPV II. CPS is primarily responsible for generating the false evidence served upon and mailed to consumers and submitted to courts in its collection actions.

### Defendants' Debt Buying Operation

18.    Defendants accomplish their debt-buying operation by purchasing multiple multi-million dollar portfolios of distressed and charged-off consumer debt from original creditors. Many of these debts are credit card accounts.

19.    The personnel and resources used to accomplish and transact these purchases are nearly all those maintained in the name of Cavalry. Cavalry employees negotiate the deals and purchase the portfolios, regardless as to whether or not Cavalry then titles them in the name of SPV I or SPV II.

20.    When Defendants collectively purchase debt portfolios, such as the portfolios that contained each Plaintiff's account, they do not actually purchase anything other than the theoretical claim of ownership. There are no notes assigned, and no contracts are transferred. All that Defendants actually purchase is an electronic list of consumers and their last known addresses with an amount the creditor claims to have been owed. Often the interest rates, dates of birth or social security numbers are not included, and addresses have not been updated.

21.    In fact, though Defendants will often produce what is claimed to be an original cardmember agreement or document containing terms and conditions of a credit card account, these documents are false. However, creditors who do transfer or make available later the "terms and conditions" or cardmember agreements do not provide Defendants the actual agreement or documents for that specific account. Instead, the creditors provide, and the Defendants retain, only a generic sample contract, which they later represent to Courts as the genuine contract for that specific consumer account.

### Defendants' Fraudulent Conduct

22.    To aid in litigation against consumers, the Defendants have established relationships with many different debt collection law firms in the country who serve less in the capacity as traditional legal counsel, and more as an outsource vendor. The law firms are paid a contingency percentage of recovery, and they exercise no control over any Defendant nor do they submit to control over their own practices by the Defendants.

23.    Instead the third party law firms are part of Defendants' enterprise to engage in abuse of process as a means to collect the purchased accounts from consumers.

24.    Defendants use these third party law firms and the General District Courts in the Commonwealth of Virginia, as well as courts across the country, as a means to collect from consumers in a manner that does not comply with Virginia or federal law.

25.    As an example of one such violation, Defendants submit affidavits with the warrant in debts that they file in the General District Courts that contain numerous material falsehoods. These affidavits misrepresent that the affiant has personal knowledge of the account, that the affiant had reviewed the actual contractual documents regarding the account, or even that such documents existed.

6

26. The affiants have no such personal knowledge nor do they review the actual signed contract documents pertaining to the account in question.

27. Furthermore, upon information and belief, the claimed affiant is at times not the actual individual who signs the affidavit. Instead, other individuals sign the sworn affidavit, claiming to be the affiant whose name appears on the affidavit.

28. For example, and without limitation, Plaintiffs' counsel has reviewed numerous affidavits containing the signatures of Stephanie Cappelli (examples attached as Exhibit "A"), Louis Dardignac (examples attached as Exhibit "B"), Christina Martinez (examples attached as Exhibit "C"), and Giovanni Rodriguez (examples attached as Exhibit "D"). These signatures vary from affidavit to affidavit.

29. Some or all of these signatures are signed by a person other than the named affiant.

30. In addition, Defendants attach a "Summary Screen" to the affidavits filed with the Courts in an attempt to mislead the court into the belief that the Summary Screen was part of the affidavit and was reviewed by the affiant.

31. These fraudulent affidavits and summary screens are then filed with the General District Courts and are mailed to consumers in debt collection communications.

### Defendants' Specific Collection Conduct Regarding Mabel Crockett

32. The Defendants allege that one or more debts owed by Ms. Crockett were consigned, placed or otherwise transferred to Defendants for collection.

33. In an attempt to collect on one of these debts, Defendants filed a Warrant in Debt against Ms. Crockett in Prince George General District Court.

7

34.     The Defendants submitted a false affidavit along with this Warrant in Debt, misrepresenting that the affiant had personal knowledge of the account and had reviewed the account records.

35.     This affidavit was purportedly signed by Anne Thomas and was notarized by Penny Shemtob on January 13, 2012. A copy of this affidavit is attached to this Complaint as Exhibit "E".

36.     Additionally, the Defendants also submitted an "Agreement to Terms and Definitions" with the Warrant in Debt. Upon information and belief, this was only a generic agreement used by the original creditor during the time that Ms. Crockett opened the account and was not the actual agreement relating to Ms. Crockett's account.

37.     The Defendants mailed a copy of the Warrant in Debt to Ms. Crockett, including copies of the affidavit and the Agreement to Terms and Definitions, on or around March 19, 2012. Upon information and belief, these documents were sent via first class mail through the United States Postal Service.

38.     Neither the affidavit nor the Agreement to Terms and Definitions contained a disclosure that the communication was from a debt collector.

39.     In order to obtain the default judgment, the General District Court relied upon the false collection affidavit and Agreement to Terms and Definitions attachment that were presented to the General District Court judge in May 2012, when counsel for the Defendants asked for judgment on the (false) affidavit.

40.     Ms. Crockett has suffered actual damages as a result of these illegal collection actions by the Defendants in the form of pecuniary loss, anxiety, emotional distress, fear, frustration, humiliation and embarrassment, amongst other negative emotions.

8

**Defendants' Specific Collection Conduct Regarding Brenda Arnold**

41.     The Defendants allege that one or more debts owed by Ms. Arnold were consigned, placed or otherwise transferred to Defendants for collection.

42.     In an attempt to collect on one of these debts, Defendants filed a Warrant in Debt against Ms. Arnold in Prince George General District Court.

43.     The Defendants submitted a false affidavit along with this Warrant in Debt, misrepresenting that the affiant had personal knowledge of the account and had reviewed the account records.

44.     This affidavit was purportedly signed by Stephanie Cappelli and was notarized by Louis Dardignac on March 14, 2011. A copy of this affidavit is attached to this Complaint as Exhibit "F".

45.     Additionally, the Defendants also submitted several pages of what appears to be a cardholder agreement with the Warrant in Debt. Upon information and belief, this was only a generic agreement used by the original creditor during the time that Ms. Arnold opened the account and was not the actual agreement relating to Ms. Arnold's account. In fact, one of the letters attached to the Warrant in Debt is addressed to "Sample A. Sample".

46.     The Defendants mailed a copy of the Warrant in Debt to Ms. Arnold, including copies of the affidavit and the cardholder agreement, on or around May 31, 2012. Upon information and belief, these documents were sent via first class mail through the United States Postal Service.

47.     Neither the affidavit nor the cardholder agreement contained a disclosure that the communication was from a debt collector.

48.     In order to obtain the default judgment, the General District Court relied upon the false collection affidavit and cardholder agreement attachment that were presented to the General District Court judge in July 2012, when counsel for the Defendants asked for judgment on the (false) affidavit.

49.     Ms. Arnold has suffered actual damages as a result of these illegal collection actions by the Defendants in the form of pecuniary loss, anxiety, emotional distress, fear, frustration, humiliation and embarrassment, amongst other negative emotions.

### Defendants' Specific Collection Conduct Regarding Constance Smith

50.     The Defendants allege that one or more debts owed by Ms. Smith were consigned, placed or otherwise transferred to Defendants for collection.

51.     In an attempt to collect on one of these debts, Defendants filed a Warrant in Debt against Ms. Smith in Spotsylvania County General District Court.

52.     The Defendants submitted a false affidavit along with this Warrant in Debt, misrepresenting that the affiant had personal knowledge of the account and had reviewed the account records.

53.     This affidavit was purportedly signed by Stephanie Cappelli and was notarized by Eddie Martinez on September 25, 2012. A copy of this affidavit is attached to this Complaint as Exhibit "G".

54.     The Cappelli signature on this Affidavit is drastically different from the Cappelli signature on Exhibit B. Upon information and belief, one or both of these signatures were forged.

55.     Additionally, the Defendants also submitted several pages of what appears to be a cardholder agreement with the Warrant in Debt. Upon information and belief, this was only a

generic agreement used by the original creditor during the time that Ms. Smith opened the account and was not the actual agreement relating to Ms. Smith's account.

56.     The Defendants mailed a copy of the Warrant in Debt to Ms. Smith, including copies of the affidavit and the cardholder agreement, on or around October 16, 2012. Upon information and belief, these documents were sent via first class mail through the United States Postal Service.

57.     Neither the affidavit nor the cardholder agreement contained a disclosure that the communication was from a debt collector.

58.     In order to obtain the default judgment, the General District Court relied upon the false collection affidavit and cardholder agreement attachment that were presented to the General District Court judge in December 2012, when counsel for the Defendants asked for judgment on the (false) affidavit.

59.     Ms. Smith has suffered actual damages as a result of these illegal collection actions by the Defendants in the form of pecuniary loss, anxiety, emotional distress, fear, frustration, humiliation and embarrassment, amongst other negative emotions.

**Defendants' Specific Collection Conduct Regarding John Hughes**

60.     The Defendants allege that one or more debts owed by Mr. Hughes were consigned, placed or otherwise transferred to Defendants for collection.

61.     In an attempt to collect on one of these debts, Defendants filed a Warrant in Debt against Mr. Hughes in Charlotte General District Court.

62.     The Defendants submitted a false affidavit along with this Warrant in Debt, misrepresenting that the affiant had personal knowledge of the account and had reviewed the account records.

63.     This affidavit was purportedly signed by Stephanie Cappelli and was notarized by Christina Martinez on January 13, 2012. A copy of this affidavit is attached to this Complaint as Exhibit "H".

64.     The Cappelli signature on this Affidavit is drastically different from the Cappelli signature on Exhibit B. Upon information and belief, one or both of these signatures were forged.

65.     Additionally, the Defendants also submitted a "Credit Card Account Agreement" with the Warrant in Debt. Upon information and belief, this was only a generic agreement used by the original creditor during the time that Mr. Hughes opened the account and was not the actual agreement relating to Mr. Hughes's account.

66.     The Defendants mailed a copy of the Warrant in Debt to Mr. Hughes, including copies of the affidavit and the credit card account agreement, on or around May 1, 2012. Upon information and belief, these documents were sent via first class mail through the United States Postal Service.

67.     Neither the affidavit nor the Credit Card Account Agreement contained a disclosure that the communication was from a debt collector.

68.     In order to obtain the default judgment, the General District Court relied upon the false collection affidavit and credit card account agreement attachment that were presented to the General District Court judge in June 2012, when counsel for the Defendants asked for judgment on the (false) affidavit.

69.     In an attempt to collect on this judgment, the Defendants filed a Suggestion for Summons in Garnishment against Mr. Hughes in which they sought to collect judgment costs in the amount of $66.00. However, the Warrant in Debt only provided for $56.00 in judgment costs.

70.     Therefore, the total amount due on the Suggestion was misrepresented to be more than Mr. Hughes actually owed.

71.     In Virginia, it is a class 1 misdemeanor for a judgment creditor to knowingly give false information in a suggestion for garnishment. VA. CODE § 8.01-511.

72.     Mr. Hughes has suffered actual damages as a result of these illegal collection actions by the Defendants in the form of pecuniary loss, anxiety, emotional distress, fear, frustration, humiliation and embarrassment, amongst other negative emotions.

**Defendants' Specific Collection Conduct Regarding Martha Hughes**

73.     The Defendants allege that one or more debts owed by Mrs. Hughes were consigned, placed or otherwise transferred to Defendants for collection.

74.     In an attempt to collect on one of these debts, Defendants filed a Warrant in Debt against Mrs. Hughes in Charlotte General District Court.

75.     The Defendants submitted a false affidavit along with this Warrant in Debt, misrepresenting that the affiant had personal knowledge of the account and had reviewed the account records.

76.     This affidavit was purportedly signed by Giovanni Rodriguez and was notarized by Louis Dardignac on June 8, 2011. A copy of this affidavit is attached to this Complaint as Exhibit "I".

77.     Additionally, the Defendants also submitted an "Agreement to Terms and Definitions" with the Warrant in Debt. Upon information and belief, this was only a generic agreement used by the original creditor during the time that Mrs. Hughes opened the account and was not the actual agreement relating to Mrs. Hughes's account.

78.     The Defendants mailed a copy of the Warrant in Debt to Mrs. Hughes, including copies of the affidavit and the Agreement to Terms and Definitions, on or around October 11, 2011. Upon information and belief, these documents were sent via first class mail through the United States Postal Service.

79.     Neither the affidavit nor the Credit Card Account Agreement contained a disclosure that the communication was from a debt collector.

80.     In order to obtain the default judgment, the General District Court relied upon the false collection affidavit and Agreement to Terms and Definitions attachment that were presented to the General District Court judge in December 2011, when counsel for the Defendants asked for judgment on the (false) affidavit.

81.     Ms. Hughes has suffered actual damages as a result of these illegal collection actions by the Defendants in the form of pecuniary loss, anxiety, emotional distress, fear, frustration, humiliation and embarrassment, amongst other negative emotions.

**COUNT ONE:**
**VIOLATION OF 15 U.S.C. § 1692d**
**(Plaintiffs Crockett, Arnold, Smith, and Mr. Hughes)**

82.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

83.     The Defendants violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692d by their actions, which include, but are not limited to, abusing, lying to, and harassing the Plaintiffs.

84.     As a result of the actions taken by the Defendants, Plaintiffs have incurred actual damages.

85.     Plaintiffs are therefore entitled to an award of actual and statutory damages against the Defendants, as well as their reasonable attorney's fees and costs, pursuant to 15 U.S.C. § 1692k.

**COUNT TWO:**
**VIOLATION OF 15 U.S.C. § 1692d(1)**
**(Plaintiff John Hughes Only)**

86.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

87.     The Defendants violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692d(1) by their actions, which include, but are not limited to, using criminal means to harm the Plaintiffs.

88.     As a result of the actions taken by the Defendants, which include, but are not limited to, attempting to garnish funds that were not awarded in the underlying judgment, or which were not otherwise proper under Virginia law, the Defendants committed a violation of Virginia Code § 8.01-511, an offense classified as a Class 1 misdemeanor.

89.     Plaintiff John Hughes is therefore entitled to an award of actual and statutory damages against the Defendants, as well as his reasonable attorney's fees and costs, pursuant to 15 U.S.C. § 1692k, as well as VA. CODE § 8.01-271.1.

**COUNT THREE:**
**VIOLATION OF 15 U.S.C. § 1692e**
**(Plaintiffs Crockett, Arnold, Smith, and Mr. Hughes)**

90.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

91.     The Defendants violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692e by their actions, which include, but are not limited to, using false, deceptive, or misleading representations or means in connection with the collection of a debt.

92.     As a result of these actions taken by the Defendants, the Plaintiffs have incurred actual damages.

93.     Plaintiffs are therefore entitled to an award of actual and statutory damages against the Defendants, as well as their reasonable attorney's fees and costs, pursuant to 15 U.S.C. § 1692k.

## COUNT FOUR:
### VIOLATION OF 15 U.S.C. § 1692e(2)
### (Plaintiffs Crockett, Arnold, Smith, and Mr. Hughes)

94.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

95.     The Defendants violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692e(2) by their actions, which include, but are not limited to, falsely representing the amount or legal status of a debt owed.

96.     As a result of these actions taken by the Defendants, Plaintiffs have incurred actual damages.

97.     Plaintiffs are therefore entitled to an award of actual and statutory damages against the Defendants, as well as their reasonable attorney's fees and costs, pursuant to 15 U.S.C. § 1692k.

## COUNT FIVE:
**VIOLATION OF 15 U.S.C. § 1692e(10)**
**(Plaintiffs Crockett, Arnold, Smith, and Mr. Hughes)**

98.   Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

99.   The Defendants violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692e(10) by their actions, which include but are not limited to, using a false representation as a means to collect a debt.

100.   As a result of these actions taken by the Defendants, Plaintiffs have incurred actual damages.

101.   Plaintiffs are therefore entitled to an award of actual and statutory damages against the Defendants, as well as their reasonable attorney's fees and costs, pursuant to 15 U.S.C. § 1692k.

## COUNT SIX:
**VIOLATION OF 15 U.S.C. § 1692e(11)**
**(Plaintiffs Crockett, Arnold, Smith, and Mr. Hughes)**

102.   Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

103.   The Defendants sent communications to the Plaintiffs that bore the legend "Affidavit of Claim" ("Affidavit").   They also caused the same to be served upon them by law enforcement.

104.   The Defendants also sent communications to each of the Plaintiffs which purported to their contract with the original creditor of their account, and which allegedly contained information indicating the details of the account.   They also caused the same to be served upon the Plaintiffs by law enforcement. They attached this document to the Affidavits to

17

mislead the Plaintiffs and the Court into the belief that the contract was part of the Affidavit.

105.     The Affidavit and the alleged credit agreements each failed to inform the Plaintiffs that the Defendants were debt collectors, that they were attempting to collect a debt, and/or that any information obtained would be used for that purpose, in violation of 15 U.S.C. § 1692e(11).

106.     As a result of these actions taken by the Defendants, Plaintiffs have incurred actual damages.

107.     Plaintiffs are therefore entitled to an award of actual and statutory damages against Defendants as well as their reasonable attorney's fees and costs, pursuant to 15 U.S.C. § 1692k.

**COUNT SEVEN:**
**VIOLATION OF 15 U.S.C. § 1692f**
**(Plaintiffs Crockett, Arnold, Smith, and Mr. Hughes)**

108.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

109.     The Defendants violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692f by their actions, which include, but are not limited to, using unfair means to collect or to attempt to collect a debt.

110.     As a result of these actions taken by the Defendants, Plaintiffs have incurred actual damages.

111.     Plaintiffs are therefore entitled to an award of actual and statutory damages against the Defendants, as well as their reasonable attorney's fees and costs, pursuant to 15 U.S.C. § 1692k.

**COUNT EIGHT:**
**VIOLATION OF 15 U.S.C. § 1692f(1)**
**(Plaintiff John Hughes Only)**

112.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

113.    The Defendants violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692f(1) by their actions, which include, but are not limited to, the collection of an amount that is not permitted by law.

114.    As a result of these actions taken by the Defendants, Plaintiff John Hughes has incurred actual damages.

115.    Plaintiff John Hughes is therefore entitled to an award of actual and statutory damages against the Defendants, as well as his reasonable attorney's fees and costs, pursuant to 15 U.S.C. § 1692k.

**COUNT NINE:**
**Violation of 18 U.S.C. § 1962(c)**
**Racketeer Influenced and Corrupt Organizations Act**
**(All Plaintiffs)**

116.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

117.    Plaintiff alleges a cause of action against the Defendants for their violation of 18 U.S.C. § 1962(c).

118.    Each of the Plaintiffs is a "person" as defined by 18 U.S.C. § 1961(3).

119.    As alleged above, the Defendants used an elaborate debt collection enterprise in order to conduct debt collection activity without regard to the Plaintiffs' rights under the law.

120.    For example and without limitation, Cavalry formed two shell entities, SPV I, and SPV II, to purchase the portfolio of charged-off debt from original creditors, including credit

card companies. Cavalry also formed a company, CPS, in order to "service" these accounts, often by threatening, harassing, and abusing consumers. CPS also attempts to collect these debts by hiring third party collection firms. These third party collection firms request CPS to generate an affidavit that the collection firm can provide to a court when suing a consumer for the defaulted debt. Upon information and belief, the request for these affidavits is made electronically using the wires. Once CPS receives a request for an affidavit to be generated, one or more of its employees sign and notarize the affidavit, which states that the affiant has personal knowledge of the debt and/or that the affiant has reviewed documents related to the consumer's account. Upon information and belief, the individual(s) signing these affidavits has no such personal knowledge, nor does the individual(s) review any documentation relating to the consumer's account. Further, upon information and belief, these individuals do not have access to the records necessary to gain personal knowledge regarding the accounts. Once the affidavits have been signed, the original is sent to the third party collection firm for use in filing a lawsuit against a consumer.

121.   The law firms are well aware that these affidavits are false. Similarly, the Defendants know that their affidavits are improperly signed and notarized. However, both the Defendants and the third party collections firms know that they would be unable to obtain a judgment without such an affidavit. Therefore, the enterprise continues to manufacture these affidavits in order to continue obtaining judgments against consumers and to remain profitable. The third party collection law firms continue to participate in the enterprise because, upon information and belief, they are paid a contingency fee based on the dollar amounts of the judgments that they obtain against consumers.

122.   The Defendants and their third party collection law firms across the country

20

(including Kramer, Linkie & Taylor, LLC and Dominion Law Associates) constitute an "enterprise" as defined by 18 U.S.C § 1961, as distinct corporations or legal entities.

123.    In addition, upon information and belief, Plaintiffs allege that Defendants worked with third-party attorneys and other persons to help them create the false collection affidavits and procedures alleged herein, drafting language that the Defendants and these attorneys and other persons knew would be interpreted incorrectly by consumers and courts around the country.  The Defendants and these third party attorneys or other persons specifically designed the affidavits to be misinterpreted.  Such conduct was not simply unethical, but was criminal as well.

124.    All of these law firms and each Defendant were engaged for a common economic purpose of enabling the collection of consumer accounts purchased by Cavalry.

125.    Further, the law firms and the Defendants existed as a collection enterprise outside the function of creating and causing to be presented to courts the fraudulent collection affidavits.  That is, they were not associated with one another merely for the purpose of creating and using the affidavits.

126.    The collection law firms are separate entities and each operates in its own self-interest.  They are organizationally structured in a defined set of relationships and roles and are so engaged for an ongoing continuous business relationship.

127.    The racketeering proceeds obtained by Defendant CPS as a result of the activities of the enterprise flowed through Defendant CPS, to Defendants SPV I and SPV II, and ultimately to Defendant Cavalry.  The proceeds were also used by each such person in continued furtherance of the enterprise, including, but not limited to continuing to pay the salaries of the employees who continued to sign and transmit the affidavits through the mail, as well as the salaries of those who supervised them and directed their actions.

128.    Additionally, the racketeering proceeds obtained by the Defendants as a result of their scheme to defraud consumers and courts across the country were then reinvested into the enterprise to continue the pattern of racketeering activity, that is to say the proceeds and/or profits were used to pay the third party collection firms for their participation in the enterprise, to purchase additional defaulted consumer accounts, such as the Plaintiffs in this case, and the ongoing operation of the Defendants' enterprise.

129.    The enterprise had an effect on interstate commerce. The transmission of the false affidavits through the United States mail system for re-transmission by the local collection firms (again back through the United States mail system) to consumers and various state courts affected interstate commerce. The transmission of the racketeering proceeds back to the Defendants by use of the United States mail system or via electronic wires also affected interstate commerce. Its consumer targets are scattered across the country. Court fees are paid across the country, and judgments are then taken and enforced in many states, including the Commonwealth of Virginia.

130.    In their enterprise, the Defendants engaged in a pattern of racketeering activity. It continues to date and will be repeated again and again in the future to the detriment of Virginia consumers.

131.    The conduct and actions of the Defendants as alleged herein – creating fraudulent affidavits for use in collection lawsuits – violated the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343. They involved an ongoing scheme to defraud consumers and courts, and they used both the mails and the interstate wires.

132.    Defendants used this practice with respect to numerous affidavits that it caused to be filed in General District Courts across the Commonwealth of Virginia for years. Plaintiffs'

counsel has reviewed the actual court files from dozens of cases filed by the Defendants, and all of these contain the same fraudulent affidavits.

133. Further, Defendants and the enterprise follow the same unlawful procedures nationwide for the same purposes, and with the same results, victims and methods of committing the offense alleged herein.

134. Both the Plaintiffs and the General District Courts relied on the fraudulent affidavits.

135. Plaintiffs were injured as a result of the Defendants' violations of 18 U.S.C. § 1962(c) and are entitled to treble their actual damages, the cost of this suit, and reasonable attorney's fees.

136. Plaintiffs also seek an injunction ordering the Defendants to divest themselves of any interest in any enterprise pled herein, including the receipt of racketeering profits; prohibiting the Defendants from continuing to engage in any enterprise pled herein; and ordering the dissolution of each Defendant that has engaged in any enterprise pled herein.

### COUNT TEN:
### Virginia Abuse of Process
### (All Plaintiffs)

137. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

138. Defendants' filing of the state court collection lawsuit and improper use of the affidavits was accomplished with the improper motive and purpose of obtaining a judgment on a debt that it could not confirm or know was actually owed by the Plaintiffs and was accomplished through the improper use of a false affidavit as means to circumvent the impossible burdens faced if they actually had to prove an indebtedness.

139.    Defendants conducted themselves in this manner with intent to defraud and with legal and actual malice as to the Plaintiffs and to General District Courts. The Plaintiffs are therefore entitled to and each Defendant is obligated to pay punitive damages.

140.    As a result of the Defendants' civil conspiracy, the Plaintiffs suffered actual damages in the form of economic injury. They also suffered substantial unliquidated and noneconomic damages for the damage to their reputation, their time and their ongoing distress over the subject debts.

WHEREFORE, Plaintiffs demand judgment for compensatory, statutory, punitive and treble damages against the Defendants pursuant to the FDCPA, and RICO; for declaratory and injunctive relief pursuant to RICO; for their attorney's fees and costs pursuant to the FDCPA; and such other relief the Court deems just, equitable, and proper.

**TRIAL BY JURY IS DEMANDED.**

                                   Respectfully submitted,
                                   **MABLE CROCKETT,**
                                   **BRENDA ARNOLD,**
                                   **CONSTANCE SMITH,**
                                   **JOHN HUGHES, and**
                                   **MARTHA HUGHES**

                                   By _____
                                        Of Counsel

Matthew J. Erausquin, VSB No. 65434
Janelle E. Mason, VSB No. 82389
Casey S. Nash, VSB No. 84261
*Counsel for the Plaintiffs*
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
Tel:    (703) 273-7770
Fax:    (888) 892-3512
matt@clalegal.com
janelle@clalegal.com
casey@clalegal.com